UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| CARLOS BENITEZ, an individual person, and VALERIE BENITEZ, an individual person,<br><br>Plaintiffs,<br><br>v.<br><br>GRESHAM-BARLOW SCHOOL DISTRICT, an Oregon school district created and operating under the laws of the State of Oregon, DANIELLE HEIKKILA, as vice principal of Gresham High School and in her individual capacity, and KATE ALLEN, as counselor of Gresham High School and in her individual capacity,<br><br>Defendants. | Case No. 3:12-CV-1003 -ST<br><br>OPINION AND ORDER |

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiffs, Valerie and Carlos Benitez, bring this action against the Gresham-Barlow School District ("School District") and two of its employees who work at Gresham High School, Vice Principal Danielle Heikkila ("Heikkila") and school counselor Kate Allen ("Allen"). Plaintiffs allege common law claims for intentional infliction of emotional distress ("IIED") (First Claim) and negligence (Second Claim) and for violation of their substantive due process rights pursuant to 42 USC § 1983 (Third Claim). This court has subject matter jurisdiction over

1 – OPINION AND ORDER

the § 1983 claim pursuant to 28 USC § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 USC § 1367.

Currently before the court is defendants' Motion to Dismiss (docket #14). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (docket #13). For the reasons that follow, defendants' motion is GRANTED.

## ALLEGATIONS

In January 2010, plaintiffs and their minor daughter ("T.")[1] had a dispute over whether T. could drive to a school dance. Second Amended Complaint (docket #12), ¶ 7. T. ran away to her grandmother's house and plaintiffs decided to give her some space so they consented to the arrangement. *Id*. At the time, T. was a 16-year old junior attending Gresham High School. *Id*, ¶ 8. During all times relevant to the complaint, T.'s grandmother had no legal authority over T. who was not legally emancipated from her parents' care, custody, or jurisdiction. *Id*, ¶¶ 8, 11.

In February 2010, the School District permitted T. to attend an off-campus school activity without plaintiffs' permission or advance notification of the event. *Id*, ¶ 10. Plaintiffs learned of T.'s attendance at the event after they received a telephone call from Gresham High's automated attendance notification system, informing them that T. had missed class. *Id*. Shortly thereafter, plaintiffs met with Heikkila, explaining that though T. was living with her grandmother, her grandmother had no legal authority over T. *Id*, ¶ 11. Heikkila informed plaintiffs that T.'s grandmother had signed the permission slip, but agreed to "flag" T.'s name to prevent future unauthorized activities. *Id*.

---

[1] Though the parties refer to plaintiffs' daughter by name in their pleadings, she was a minor at the time of the events which form the basis for the current dispute. Thus, she will be referred to her only by her first initial.

2 – OPINION AND ORDER

Shortly after this meeting, Heikkila emailed T.'s proposed fall schedule to plaintiffs and asked plaintiffs to sign off on it since the School District's policy required parent signatures in order for a student to enroll in certain courses. *Id*, ¶ 12. Plaintiffs did not respond to the email or otherwise sign off on the courses. *Id*. Sometime thereafter, Heikkila emailed plaintiffs, seeking their consent to allow T. to attend another off-campus school activity. *Id*, ¶ 13. Plaintiffs did not respond to the email but met with the instructor and informed him that T. was not allowed to attend. *Id*.

In March 2010, T. informed plaintiffs that that Allen, a school counselor, had advised T. to seek emancipation, file for independent status, and take advantage of social programs offered to homeless students. *Id*, ¶ 14.

In April 2010, T. left her parents a voicemail message informing them that Allen had arranged a "mediation" session for T. and her parents, with Allen serving as the mediator. *Id*, ¶ 15. Plaintiffs did not attend the mediation, later telling Allen that they did not believe she was qualified to work with the family to resolve their dispute and that should instead encourage T. to call plaintiffs to resolve the conflict. *Id*.

In May 2010, plaintiffs again learned through the automated attendance system that T. had missed class. *Id*, ¶ 16. Plaintiffs learned that the absence was because T. had again attended an off-campus school activity to which they had not consented or been given advance notice. *Id*. As she had before, T.'s grandmother had signed the permission slip allowing T. to attend. *Id*. Plaintiffs met with Heikkila who told them that she had warned T. about the authorization policy, yet "somehow" the school staff "overlooked" the fact that the permission slip had not been signed by plaintiffs. *Id*. Plaintiffs asked Heikkila to facilitate a disciplinary meeting between

them and T. to discuss her behavior. *Id*. Heikkila declined to schedule such a meeting, but did give T. detention as punishment for breaking the authorization policy. *Id*.

During the summer of 2010, plaintiffs received a copy of T.'s fall schedule which included an authorization form for them to sign and return. *Id*, ¶ 18. Plaintiffs again refused to sign off on T.'s class schedule. *Id*. However, when classes started in the fall, T. was permitted to attend the courses without plaintiffs' authorization and contrary to School District policy. *Id*, ¶ 20. Plaintiffs contend that this undermined their ability to parent, their objectives in withholding their consent, their authority to determine in what courses T. would enroll and ultimately empowered T. to further rebel against them. *Id*, ¶ 21.

In December 2010, T. was caught near campus in possession of marijuana and suspended from school. *Id*, ¶ 22. Heikkila notified plaintiffs of the suspension by leaving a voicemail message. *Id*. During a meeting with Heikkila about the incident, plaintiffs were notified that the suspension was a result of marijuana possession and that when T. was caught, she had falsely told Heikkila that she was emancipated from her parents, so Heikkila had contacted T.'s grandmother to come pick her up from school. *Id*. Heikkila contacted plaintiffs once she learned that T. was not, in fact, emancipated. *Id*. Because the School District's policy required Heikkila to notify plaintiffs immediately after T. was caught with an illegal substance near campus, plaintiffs arranged a meeting with Heikkila's supervisor, Principal John Koch ("Koch"). *Id*, ¶ 23. During the meeting, Koch defended Heikkila's actions, stated that he had assisted Heikkila in making the decision not to contact plaintiffs initially and promised that in the future, plaintiffs would be involved in any matter concerning their daughter. *Id*.

On or about January 11, 2011, plaintiffs received a voicemail from Heikkila stating that she had met with T. to discuss T.'s return to school and had determined that T. could return to

school five days early since she had met with a drug and alcohol counselor and would continue meeting with the counselor once she returned to school. *Id*, ¶ 24. Plaintiffs had not been involved in any of the proposed terms regarding T.'s return to school. *Id*. Later that month, plaintiffs spoke to James Hiu ("Hiu"), the School District's Director of Secondary Education. *Id*, ¶ 25. He agreed that there had been a "gross misapplication" of the School District's policies as they related to plaintiffs' problems with the staff at Gresham High. *Id*.

As of the filing of the Second Amended Complaint, plaintiffs have not spoken to T. in more than a year. *Id*, ¶ 51.

## STANDARDS

In order to state a claim for relief, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" FRCP 8(a)(2). This standard "does not require 'detailed factual allegations,'" but does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 US 662, 678 (2009), citing *Bell Atl. Corp. v. Twombly*, 550 US 544, 555 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*, quoting *Twombly*, 550 US at 555. In order to survive a motion to dismiss for failure to state a claim pursuant to FRCP 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*, quoting *Twombly*, 550 US at 570. In evaluating a motion to dismiss, the court must accept the allegations of material fact as true and construe those allegations in the light most favorable to the non-moving party. *Parks Sch. of Bus., Inc. v. Symington*, 51 F3d 1480, 1484 (9th Cir 1995). Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies of the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F3d 750, 758 (9th Cir 2003).

# DISCUSSION

## I. § 1983 Substantive Due Process Claim (Third Claim)

### A. Interference with Liberty Interest

The Third Claim alleges that defendants violated plaintiffs' due process rights under the Fourteenth Amendment.  To a state a § 1983 claim, a plaintiff must show that a person acting under the color of state law deprived the plaintiff of the "rights, privileges, or immunities secured by the Constitution and laws of the United States."  *Livadas v. Bradshaw*, 512 US 107, 132 (1994); *Giba v. Cook*, 232 F Supp2d 1171, 1179 (D Or 2002).  Plaintiffs contend that they have a protected liberty interest in the right to the companionship of their daughter and to make decisions concerning her care.  They contend that defendants violated this right by failing to follow the School District's written policies that required parental consent and notification and by actively encouraging their daughter to seek emancipation, thereby undermining their parental authority, intruding into what was a private family matter, and permanently harming their relationship with their daughter.

The Supreme Court has recognized that parents have a liberty interest "in the care, custody, and control of their children" by way of the Fourteenth Amendment's substantive due process clause.  *Troxel v. Granville*, 530 US 57, 65 (2000).  It is also well-established in the Ninth Circuit that "a parent has a constitutionally protected liberty interest in the companionship and society of his or her child.  The state's interference with that liberty interest without due process of law is remediable under section 1983."  *Kelson v. City of Springfield*, 767 F2d 651, 655 (9th Cir 1985) (held that parents stated a due process claim for suicide of child occurring on school premises).  "Official conduct that shocks the conscience in depriving parents of that interest" violates due process.  *Wilkinson v. Torres*, 610 F3d 546, 554 (9th Cir 2010), *cert.*

*denied*, 131 S Ct 1492 (2011), citing *Porter v. Osborn*, 546 F3d 1131, 1137 (9th Cir 2008). What conduct satisfies this standard depends on the particular circumstances at hand, but "mere negligence" on the part of government officials is not enough. *Woodrum v. Woodward County*, 866 F2d 1121, 1126 (9th Cir 1999).

### B. Individual Defendants

The individual defendants contend that they are entitled to qualified immunity on the substantive due process claim. The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 US 800, 818 (1982). Therefore, public officials are generally immune from civil liability unless their actions violate clearly established law because "a reasonably competent public official should know the law governing his conduct." *Id.* "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant,* 502 US 224, 229 (1991) (citation and internal quotations omitted).

The qualified immunity inquiry has traditionally involved two prongs. First, the court must decide whether the plaintiff has shown that a constitutional or statutory right has been violated. *Saucier v. Katz,* 533 US 194, 201 (2001). If the first step is satisfied, the court must then decide whether the right at issue was "clearly established" at the time of the alleged violation. *Id.* However, the Supreme Court recently held that courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* 555 US 223, 236 (2009).

1. **<u>Violation of Constitutional Right</u>**

The parties disagree whether the type of interference alleged rises to the level of a cognizable deprivation of due process. Defendants characterize this case as challenging how plaintiffs' daughter was educated, counseled, and disciplined while at school, all of which are intra-school matters squarely within the control of the School District. In support, they point out that the Ninth Circuit has made clear that a parent's right to the control their child "does not extend beyond the threshold of the school door." *Fields v. Palmdale Sch. Dist.*, 427 F3d 1197, 1207 (9th Cir 2005), *aff'd*, 447 F3d 1187 (*per curiam*), *cert denied*, 549 US 1089 (2006). *Fields* defined the boundaries of a parent's right to the care, custody, and control of their child, clarifying that once parents choose whether to send their children to public school, "their fundamental right to control the education of their children is, at least, substantially diminished." *Id* at 1206. The Ninth Circuit went on to expressly adopt the following statement from the Sixth Circuit:

> Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school, or . . . a dress code, these issues of public education are generally committed to the control of state and local authorities.

*Id*, citing *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F3d 381, 395-96 (6th Cir 2005).

Plaintiffs contend that *Fields* is inapplicable because it concerned wholly intra-school matters, in particular, the distribution to elementary school children of a survey containing questions about sex . Here, in contrast, plaintiffs allege that school officials took various actions in violation of School District policies that resulted in the termination of their daily contact with their child. Although not specifically alleged, plaintiffs' theorize that if the School District had

followed its policies, T. would have been denied participation in requested courses and extra-curricular activities, forcing her to communicate with her parents and move back home.

A recent case from the Eastern District of Michigan, while not binding on this court, involved a factually analogous situation in which parents claimed that school officials interfered with their due process right to decide matters concerning the development and upbringing of their children. *Reardon v. Midland Cmty. Schs.*, 814 F Supp2d 754, 763 (ED Mich 2011). The parents alleged that a school principal and school counselor provided assistance and advice to their child who ultimately decided to permanently leave her parents' home. In particular, they advised the student on an "exit strategy," obtained a second telephone for the student to use that her parents could not access, set themselves up as intermediaries so that the student could obtain things she needed from her parents without directly interacting with them, encouraged the student to seek a personal protection order against her parents, and even offered to become a legal foster parent for the student. The court held that the alleged conduct did not violate plaintiffs' due process rights because the Fourteenth Amendment does not prohibit school officials from advising the student, suggesting solutions, providing counseling, and even offering financial assistance to help the student address the problems she was having with her parents.

Plaintiffs attempt to distinguish *Reardon* because it was decided on a summary judgment motion, rather than on a motion to dismiss. However, in reaching its conclusion, the only evidence cited by the court was an absence of any coercive pressure exerted by defendants on the student to leave her parents' home. On that basis, the court distinguished *Arnold v. Bd. of Educ. of Escambia Cnty. Ala.*, 880 F2d 305 (11th Cir 1989), *abrogated in part by Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 US 163 (1993). Instead, the evidence revealed that the school officials "undertook the actions they did to help S. address a

challenging situation by providing guidance and support." 814 F Supp2d at 771-72. Similarly here, plaintiffs do not allege or argue that defendants in any way coerced T, but merely, as in *Reardon*, provided guidance and support to T.

A case from the District of Montana, while also not binding on this court, is nevertheless instructive. In *Harry A. v. Duncan*, 351 F Supp2d 1060 (D Mont 2005), *affirmed*, 234 Fed Appx 463 (9th Cir 2007), a group of parents sought damages from the school district and various school officials on the basis that their daughters were videotaped in various stages of undress in a locker room by a group of male high school students for their viewing pleasure. The parents argued that the defendants' actions caused their daughters to be victimized, resulting in tremendous family stress and a "lack of communication between the parents and children [that] weakened the closeness of the parent child relationship, permanently altering it." *Id* at 1067. After examining relevant Ninth Circuit and Supreme Court case law, the court concluded that the parents' allegations failed to rise to the level of a constitutional injury which requires:

> the existence of a constitutionally protected right to be free from termination of the parent-child relationship or from governmental interference with the parent-child relationship so intrusive as to be the equivalent of termination of that relationship . . . [such as] the death of a child, the loss or imposition of parental rights and responsibilities, or the termination of daily contact with one's children.

*Id* at 1068.

In light of the applicable precedent, the court did not consider the plaintiffs' allegations of family stress, weakening of the closeness between parent and child, or even the permanent altering of the parent-child relationship to be sufficient to establish that they had suffered a constitutional injury. *Id*. The court went on to explain as follows:

> *Kelson* and related cases do not provide constitutional protection from any state action that has the ultimate effect of disturbing the tranquility of the parent-child relationship. If they did, one can imagine endless claims brought under § 1983, given the emotional immaturity of many teenagers

10 – OPINION AND ORDER

> and the frequently grating interactions between high school officials and students. In *Kelson*, the Ninth Circuit did not intend to allow a claim for constitutional injury every time a school official's action (or inaction) with respect to a student caused the student to behave differently at home.

*Id*.

Here plaintiffs challenge the way the school officials interacted with them and their daughter when providing information to plaintiffs about their daughter's school life, thereby interfering with their right to raise their daughter and aiding her in her rebellion against them. Second Amended Complaint, ¶ 17. Plaintiffs allege that defendants violated the School District's written policies on various issues, specifically those requiring parental authorization for extracurricular activities and enrollment in particular classes and parental notice when a student is caught in possession of marijuana near school grounds.[2] *Id*, ¶¶ 16, 17 20, 23, 26. While the Second Amended Complaint does not elaborate on the substance of these policies, it does allege that such policies existed, and that by failing to follow them, defendants unreasonably interfered with plaintiffs' ability to parent and to control their daughter's education and discipline, which ultimately encouraged T. to further rebel against them, continue her estrangement, and permanently alter the parent-child relationship. *Id*, ¶¶ 12, 18, 21, 28. Plaintiffs also take issue with defendant Allen's advice to T. that she seek legal emancipation, which was allegedly motivated by the School District's desire to take advantage of financial benefits afforded to schools with such students enrolled.

The *Reardon* court rejected similar allegations because it concluded that school officials may advise and assist students who are having problems at home. There, the school officials

---

[2] At oral argument, plaintiffs argued that defendants violated School District policies by also failing to call the police regarding T.'s possession of marijuana, knowing that the police would have released T. from custody to plaintiffs, rather than to her grandmother. This additional allegation does not cure the defect in the due process claim. Plaintiffs may have reacquired physical custody of T., but she could easily have continued her estrangement by not communicating and/or by moving back with her grandmother.

11 – OPINION AND ORDER

took even more proactive action in assisting the student than plaintiffs allege here, going so far as to provide direct financial assistance, offer to serve as a legal foster parent, encourage her to seek a protective order against her parents, purchase a cell phone that her parents could not access, and otherwise serve as intermediaries to avoid interaction with her parents.  Viewing the facts in the light most favorable to plaintiffs, defendants did not engage in conduct that "shocks the conscience" necessary to trigger substantive due process protections.  *Wilkinson*, 610 F3d at 554.  Rather, defendant Heikilla's conduct is, at most, negligent, since she failed to follow the School District's policies regarding parental notification of suspension and parental authorization for extracurricular activities and course selection.  Similarly, Allen's conduct in suggesting that T. might want to explore the option of becoming legally emancipated from her parents and her attempt to organize a "mediation" session with her parents hardly rises to the level of conduct that supports a cognizable substantive due process claim.

Plaintiffs allege that defendants' interference resulted in "estrangement from their daughter, severe emotional injury, including pain and suffering, emotional trauma, and permanent familial damage."  Second Amended Complaint, ¶ 28.  This injury is similar to the one rejected by the district court in *Harry A* on the grounds that such an interference was not intrusive enough so as to amount to a *de facto* termination of the parent-child relationship.  The parents also alleged in *Harry* A that prior to the school's interference, they had close relationships with their children which were permanently altered.   In contrast, plaintiffs here do not dispute that their relationship with T. was already strained prior to any action on the defendants' part since she had left home and was living with her grandmother.  Even accepting as true that the school's interference resulted in the termination of plaintiffs' daily contact with their daughter, this is not the type of injury that gives rise to a substantive due process claim.

The facts alleged in the Second Amended Complaint essentially boil down to plaintiffs' inability to communicate with their daughter in order to resolve a family conflict. Thus, they sought the school's assistance, albeit by way of enforcing policies already in place, to persuade their daughter to contact them to resolve those issues. They hoped that if she was unable to engage in extracurricular activities or to enroll in the classes she wanted, she would be forced to contact them to resolve their underlying familial conflict. When this strategy failed because the school permitted her to engage in those activities anyway, plaintiffs sought to hold the School District and its employees accountable by way of filing this action. Such allegations are insufficient to establish the necessary governmental interference to establish a constitutional injury. Even assuming that the relationship has been forever altered, plaintiffs have failed to allege facts sufficient to state a claim for a violation of their constitutional rights.

### 2. Clearly Established Right

Having concluded that plaintiffs have failed to allege sufficient facts to sustain their § 1983 claim for a violation of their Fourteenth Amendment right to substantive due process, the court need not reach the issue of whether the right was clearly established. Accordingly, the Third Claim alleging a violation of § 1983 claim is dismissed as to the individual defendants.

### C. School District

The School District contends that plaintiffs have failed to allege sufficient facts to state a claim against it. Local governmental units or municipalities such as the School District can be sued as a "person" under § 1983 when an official policy or custom results in a constitutional violation. *Hervey v. Estes*, 65 F3d 784, 791 (9th Cir 1995), citing *Monell v. Dep't of Soc. Servs. of City of New York,* 436 US 658, 690 (1978). Municipalities cannot "be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 US at 691. "[I]t is when execution of a

government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id* at 693; *see also Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 US 397, 403 (1997) ("[W]e have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury.").

"A plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident or unconstitutional action by a non-policymaking employee." *Davis v. City of Ellensburg*, 869 F2d 1230, 1233 (9th Cir 1989) (emphasis deleted). To establish municipal liability, plaintiffs must show that: (1) they were deprived of a constitutional right; (2) the municipality had a policy or custom; (3) the policy or custom amounted to "deliberate indifference" to plaintiffs' constitutional right; and (4) the policy was the "moving force" behind the constitutional violation. *Burke v. County of Alameda*, 586 F3d 725, 734 (9th Cir 2001), citing *Mabe v. San Bernadino County, Dep't of Pub. Soc. Servs.*, 237 F3d 1101, 1110-11 (9th Cir 2001). Since plaintiffs have not alleged sufficient facts to support their constitutional claim, the School District cannot be liable for having a policy or custom that allegedly caused a constitutional violation. Accordingly, the Third Claim against the School District for violating § 1983 is dismissed.

## II. Common Law Claims

Having concluded that plaintiffs' sole federal claim must be dismissed, the next issue is whether to exercise discretion to retain jurisdiction over the state law claims. When "the district court has dismissed all claims over which it has original jurisdiction," it has discretion to "decline to exercise supplemental jurisdiction[.]" 28 USC § 1367(c)(3). "[I]n the usual case in

which federal-law claims are eliminated before trial, the balance of the factors of economy, convenience, fairness and comity will point toward declining to exercise jurisdiction over state-law claims." *O'Connor v. State of Nev.,* 27 F3d 357, 363 (9th Cir 1994) (brackets and citation omitted), *cert. denied,* 514 US 1021 (1995).  Here, the remaining claims concern issues of state law, namely whether defendants' conduct fell outside the bounds of socially tolerable conduct or whether a special relationship existed between the educator-defendants and plaintiff-parents by way of Oregon's compulsory attendance law, and whether Oregon recognizes a legally protected interest against the negligent acts of third parties in the circumstances presented by this case. Because none of the relevant factors favors continuing to exercise jurisdiction over the remaining claims, plaintiffs' common law claims are dismissed without prejudice.

## ORDER

For the reasons stated above, defendants' Motion to Dismiss (docket #14) is GRANTED, and this case is dismissed with prejudice as to the Third Claim for Relief and without prejudice as to the First and Second Claims for Relief.

DATED September 6, 2012.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

15 – OPINION AND ORDER